**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOHN L. GANTT, | ) | |
|     Plaintiff | ) | C.A. 12-262 Erie |
| | ) | |
| v. | ) | **District Judge Bissoon** |
| | ) | **Magistrate Judge Baxter** |
| M. HARLOW, et al., | ) | |
|     Defendants. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

It is respectfully recommended that:

    1.    The Medical Defendants' motion for summary judgment [ECF No. 73] be granted; and

    2.    The DOC Defendant's motion for summary judgment [ECF No. 77] be granted.

### II.    REPORT

#### A.    Relevant Procedural History

On October 25, 2012, Plaintiff John L. Gantt, a prisoner formerly incarcerated at the State Correctional Institution at Albion, Pennsylvania ("SCI-Albion"),[1] filed a *pro se* civil rights complaint pursuant to 42 U.S.C. § 1983. [ECF No. 3]. He subsequently filed an amended complaint on November 5, 2012, which supplemented the original complaint with additional allegations. [ECF No. 8]. Named as Defendants in the original and amended complaints are: Michael Harlow, former superintendent at SCI-Albion ("Harlow"); Maxine Overton, former Chief Health Care Administrator at SCI-Albion ("Overton"); Robert L. Maxa, a physician under contract with the Pennsylvania Department of Corrections ("DOC") to provide medical services to inmates at SCI-Albion ("Maxa"); Daniel Telega, a physician's assistant formerly under

---

[1] Plaintiff is currently incarcerated at the State Correctional Institution at Fayette in LaBelle, Pennsylvania.

contract with the DOC to provide medical services to inmates at SCI-Albion ("Telega"); and Pamela J. Reynolds, a physical therapist formerly under contract with the DOC to provide physical therapy services to inmates at SCI-Albion ("Reynolds"). On September 23, 2013, District Judge Cathy Bissoon entered a Memorandum Order [ECF No. 43] dismissing Plaintiff's claims against Defendants Harlow and Reynolds, and terminating said Defendants from this case. Thus, Defendant Overton remains the sole DOC Defendant in this case, while Defendants Maxa and Telega remain as the "Medical Defendants."

Plaintiff claims that all Defendants were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights. As relief for his claims, Plaintiff seeks declaratory and injunctive relief and compensatory damages.

The parties have completed discovery, and summary judgment motions have been filed by the Medical Defendants [ECF No. 73], and by DOC Defendant Overton [ECF No. 77]. Plaintiff has filed a brief in opposition to both motions [ECF No. 104], in response to which reply briefs have been filed by Medical Defendants [ECF No. 107] and Defendant Overton [ECF No. 109]. This matter is now ripe for consideration.

### B. Relevant Factual History[2]

Plaintiff alleges that in November, 2010, he suffered a cut to his left arm and an injury to his neck while he was confined in a holding facility in Michigan. (ECF No. 3, Complaint, at ¶¶ 8-9). He subsequently began experiencing numbness in his hands and left leg, kidney pain, and loss of balance. (Id. at ¶ 8). By April 2011, Plaintiff was partly paralyzed on his left side, from his shoulder to his foot. (Id. at ¶ 10). He was transferred back to SCI-Albion in May 2011 and was told by the intake nurse that his medical information would be passed on to medical staff. (Id. at ¶ 11).

---

[2]

The factual history set forth herein is primarily derived from Medical Defendants' Concise Statement of Undisputed Material Facts [ECF No. 75], and DOC Defendant's Statement of Material Facts [ECF No. 79], but only to the extent the same have been admitted by Plaintiff in his Responsive Concise Statement [ECF No. 104] and/or are otherwise supported by the uncontroverted evidence of record.

In May 2011, Defendant Maxa requested that Plaintiff undergo a neurological consultation for gait and balance issues. (ECF No. 75, Medical Defendants' Concise Statement of Material Facts, at ¶ 12). The consult was conducted by Northshore Neurosciences via telemedicine on July 21, 2011. (Id. at ¶ 13). Plaintiff also underwent an EMG of his upper extremities and his left lower extremity on the same date. (Id. at ¶ 15). The consultation resulted in a referral for an MRI of Plaintiff's cervical spine, which was performed on September 1, 2011 at Meadville Medical Center. (Id. at ¶¶ 13, 16). Based on the MRI results, it was recommended that a neurological consult be scheduled as soon as possible. (Id. at ¶ 17). Defendant Maxa submitted a neurological consult request the same day, with specific instructions that the consult take place "ASAP." (Id. at ¶ 18). The neurological consult was done on October 4, 2011, by Dr. Diefenbach of Great Lakes Neurosurgery, who recommended that Plaintiff undergo cervical spine surgery. (Id. at ¶¶ 19-20). Pre-operative procedures and testing were completed in October 2011 and the surgery was performed at Hamot Hospital on October 26, 2011. (Id. at ¶ 21).

Plaintiff was returned to SCI-Albion on October 29, 2011 and was housed in the infirmary until his first post-operative neurosurgery appointment on November 4, 2011, which was requested by Defendant Maxa on October 31, 2011. (Id. at ¶¶ 22-23). On November 7, 2011, Defendant Maxa requested a second post-operative neurological appointment, which subsequently occurred on December 20, 2011. (Id. at ¶¶ 25-26). On December 24, 2011, Defendant Telega submitted a request for Plaintiff to have a follow-up neurological consult with Great Lakes Neurosurgery, which request was approved on December 29, 2011. (Id. at ¶¶ 27-28). The consult occurred on February 6, 2012, at which Dr. Diefenbach noted that "it would be beneficial for [Plaintiff] to start a physical therapy program to help with gait and motor weakness." (Id. at ¶¶ 29-30). The next day, Defendant Maxa submitted a request for Plaintiff to receive the recommended physical therapy. (Id. at ¶ 31).

On February 15, 2012, Plaintiff met with physical therapist Pamela Reynolds, who gave Plaintiff strengthening exercises for his right triceps and left lower extremity, and told Plaintiff to follow up in two to three months. (Id. at ¶¶ 32-33). The next day, Defendant Maxa submitted and approved a consultation for physical therapy. (Id. at ¶ 34). Reynolds saw Plaintiff again on April

26, 2012, and Plaintiff was given exercises, including back extensions and use of weights in the infirmary. (Id. at ¶¶ 35-36). Specifically, Reynolds instructed Plaintiff to do weight exercises in the infirmary three times a week, five to ten repetitions, using "green weight" for dorsal flexion and quad strengthening, and "yellow weight" for hip flexion and abduction. (Id. at ¶¶ 37-38).

On April 27, 2012, Defendant Maxa submitted a request for a follow-up physical therapy appointment in two to three months. (Id. at ¶ 39). Plaintiff was subsequently evaluated on July 13, 2012, via telemedicine, by physical therapist Zappa, who noted that Plaintiff was not being compliant with the evaluation. (Id. at ¶¶ 40-41). Defendant Telega submitted a physical therapy re-consult request later that same day. (Id. at ¶ 42).

On July 30, 2012, Plaintiff had a follow-up neurological consult with Dr. Diefenbach, during which Plaintiff noted that his neck pain and gait were better, but complained of continued pain and sensitivity in his hands and left lower extremity. His primary complaint, however, was sharp low back pain, occasionally radiating down his left leg. The results of Plaintiff's lumbar MRI were reviewed and some mild spondylosis was noted, with central disc protrusion at the L5-S1 level; however, there was "[n]o evidence of acute significant cord compression or neural foraminal impingement." Because Plaintiff noted that he had not been able to attend physical therapy at SCI-Albion, Dr. Diefenbach again recommended a course of conservative treatment and a follow-up visit in approximately six months, with a new set of cervical x-rays. (ECF No. 76-5, Plaintiff's medical records, at p. 21).

Plaintiff followed up with Reynolds on September 14, 2012, who subsequently forwarded three pages of exercise diagrams for Plaintiff to use for physical therapy, which Plaintiff denies receiving until after the filing of the instant lawsuit. (ECF No. 75 at ¶¶ 44-46; ECF No. 76-6, Plaintiff's physical therapy records, at pp. 7-9; ECF No. 104, at ¶¶ 45-46). On October 16, 2012, Plaintiff was seen by Defendant Maxa in the RHU, at which time Plaintiff complained that he had not received any physical therapy. (ECF No. 75 at ¶¶ 47-48). Plaintiff subsequently had physical therapy appointments on March 25, 2013, April 9, 2013, and July 11, 2013. (ECF No. 79, at ¶ 36).

In addition to his back concerns, Plaintiff also complained of constipation and kidney

pain in July 2011. (Id. at ¶ 50). On July 12, 2011, Plaintiff was seen by a physician's assistant, who ordered an abdominal x-ray, lab work, a urinalysis, and weekly enemas. (Id. at ¶ 51). The x-ray was performed on July 13, 2011, and Defendant Telega reviewed the results and assessed Plaintiff with a urinary tract infection. (Id. at ¶¶ 52-53). On July 21, 2011, Defendant Telega prescribed Neurontin and submitted a consultation request for Plaintiff to be evaluated by a Neuro Telemed Clinic to rule out transverse myelitis or back myalgias. (Id. at ¶ 54).

Plaintiff continued to voice complaints of "kidney problems" on July 29, 2011, and additional lab work was ordered and completed in the beginning of August. (Id. at ¶ 55). On August 10, 2011, Defendant Telega met with Plaintiff, but no examination was conducted. (Id. at ¶ 56). On October 3, 2011, Plaintiff saw Defendant Maxa in the RHU and assessed Plaintiff with bilateral flank pain, for which he ordered an ultrasound study of Plaintiff's kidneys. (Id. at ¶¶ 57-58). The ultrasound was conducted on November 1, 2011, and the results were reviewed by Defendant Maxa, who noted two complex cystic lesions in the lower pole of the left kidney. (Id. at ¶¶ 59-60). On November 7, 2011, Defendant Maxa requested that a renal ultrasound be done in three months for comparison. (Id. at ¶ 62). On November 29, 2011, Defendant Telega saw Plaintiff for complaints of kidney pain, at which time he discontinued Motrin and prescribed Tylenol for pain. (Id. at ¶¶ 63-64).

The renal ultrasound ordered by Defendant Maxa was done on February 7, 2012, and Defendant Maxa noted that the right kidney was normal, and the cyst in the left kidney was unchanged in appearance and was probably benign. (Id. at ¶¶ 66-67). On February 13, 2012, Defendant Telega requested a follow-up study to be done in six months. (Id. at ¶ 69). On February 24, 2012, Defendant Telega assessed Plaintiff for persistent pain complaints and, after consulting with Defendant Maxa, an abdominal CT scan was ordered. (Id. at ¶¶ 70-71).

Defendant saw Plaintiff again on March 22, 2012, for complaints of left side/flank swelling, at which time he assessed Plaintiff with small left renal cysts and prescribed Motrin pending the results of the CT scan. (Id. at ¶¶ 72-73). The results of the CT scan returned on March 23, 2012, and confirmed the presence of a few small left renal cysts. (Id. at ¶ 74). On April 3, 2012, Plaintiff was again seen by Defendant Telega for left flank pain, purportedly due

to constipation. (Id. at ¶ 75).

On August 16, 2012, a follow-up renal ultrasound study was completed, the results of which noted that the size of the cysts had increased from the prior study. (Id. at ¶¶ 77-78). On September 18, 2012, Plaintiff was visited by a physician assistant at his RHU cell door and Plaintiff requested to be seen by a specialist for his increased kidney pain. (Id. at ¶¶ 80-81). Defendant Maxa saw Plaintiff in the RHU on September 28, 2012 for complaints of increased pain and foul smelling urine. (Id. at ¶ 82). Plaintiff was prescribed Robaxin to work with his Percocet prescription for pain. (Id. at ¶ 83).

On October 10 2012, Defendant Maxa requested a consultation with Peter Bridges, M.D., a urologist, who evaluated Plaintiff on November 30, 2012. (Id. at ¶¶ 84-85). After reviewing Plaintiff's history and imaging studies, Dr. Bridges assessed "unclear etiology of left flank pain. The absence of any significant findings on his CAT scan and ultrasound along with the lack of any hernaturia would lead me to believe that the pain is not urologic in origin." (Id. at ¶ 86). Following the urologic consult, Plaintiff continued to complain of constipation. (Id. at ¶ 87). Between November 30, 2012, and December 31, 2012, Plaintiff's treatment of ongoing complaints of constipation included: abdominal x-rays; different medications, including, but not limited to, Miralax, Percocet, and Methadone; regular enemas; and discussions with medical professionals. (Id. at ¶ 88).

### C. Standard of Review

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment shall be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(e)(2) further provides that when a motion for summary judgment is made and supported, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond,

summary judgment should, if appropriate, be entered against that party."

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact. Fed.R.Civ.P. 56(c). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007); UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed.R.Civ.P. 56(e); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322. See also Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Garcia v. Kimmell, 2010 WL 2089639, at * 1 (3d Cir. 2010) quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The court must consider the evidence, and all

reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). See also El v. SEPTA, 479 F.3d 232, 238 (3d Cir. 2007).

A material fact is a fact whose resolution will affect the outcome of the case under applicable law. Anderson, 477 U.S. at 248. Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 247-249. If the moving party has satisfied its initial burden, the nonmoving party must, in its opposition to the motion, identify evidence of record that creates a genuine issue of material fact. Childers v. Joseph, 842 F.2d 689, 694-95 (3d Cir. 1988).

### D. Discussion

#### 1. Exhaustion of Administrative Remedies

Both the DOC Defendant and the Medical Defendants argue that the claims against them should be dismissed for Plaintiff's failure to comply with the exhaustion requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA"), which provides:

> no action shall be brought with respect to prison conditions under section 1983 of this title ... by a prisoner confined in any jail, prisons, or other correctional facility until *such administrative remedies as are available* are exhausted.

Id[3] (emphasis added).

##### a. Exhaustion Requirement

The requirement that an inmate exhaust administrative remedies applies to all inmate

---

[3] It is not a plaintiff's burden to affirmatively plead exhaustion. Jones v. Bock, 549 U.S. 199, 216 (2007) ("...failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints."). Instead, the failure to exhaust must be asserted and proven by the defendants. Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002).

suits regarding prison life, including those that involve general circumstances as well as particular episodes. Porter v. Nussle, 534 U.S. 516 (2002); Concepcion v. Morton, 306 F.3d 1347 (3d Cir. 2002) (for history of exhaustion requirement). Administrative exhaustion must be completed prior to the filing of an action. McCarthy v. Madigan, 503 U.S. 140, 144 (1992). Federal courts are barred from hearing a claim if a plaintiff has failed to exhaust all the available remedies. Grimsley v. Rodriquez, 113 F.3d 1246 (Table), 1997 WL 2356136 (Unpublished Opinion) (10th Cir. May 8, 1997).[4] The exhaustion requirement is not a technicality, rather it is federal law which federal district courts are required to follow. Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000) (by using language "no action shall be brought," Congress has "clearly required exhaustion").[5]

The PLRA also requires "proper exhaustion" meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules of that grievance system. Woodford v. Ngo, 548 U.S. 81, 87-91 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules ..."). Importantly, the exhaustion requirement may not be satisfied "by filing an untimely or otherwise procedurally defective ... appeal." Id. at 83; see also Spruill v. Gillis, 372 F.3d 218, 228-29 (3d Cir. 2004) (utilizing a procedural default analysis to reach the same conclusion) (" Based on our earlier

---

[4] Importantly, a plaintiff's failure to exhaust his administrative remedies does not deprive the district court of subject matter jurisdiction. Nyhuis v. Reno, 204 F.3d 65, 69 n.4 (3d Cir. 2000) ("...[W]e agree with the clear majority of courts that §1997e(a) is *not* a jurisdictional requirement, such that failure to comply with the section would deprive federal courts of subject matter jurisdiction.").

[5] There is no "futility" exception to the administrative exhaustion requirement. Banks v. Roberts, 2007 WL 3096585, at * 1 (3d Cir.) citing Nyhuis, 204 F.3d at 71 ("[Plaintiff's] argument fails under this Court's bright line rule that 'completely precludes a futility exception to the PLRA's mandatory exhaustion requirement.'"). See also Woodford v. Ngo, 548 U.S. 81, 85 (2006) ("Indeed, as we held in *Booth*, a prisoner must now exhaust administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.").

discussion of the PLRA's legislative history, [...] Congress seems to have had three interrelated objectives relevant to our inquiry here: (1) to return control of the inmate grievance process to prison administrators; (2) to encourage development of an administrative record, and perhaps settlements, within the inmate grievance process; and (3) to reduce the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits.").

### b. Exhaustion Procedure

No analysis of exhaustion may be made absent an understanding of the administrative process available to state inmates. "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Jones v. Bock, 549 U.S. at 218.

The DC-ADM 804 grievance system, available to state prisoners, consists of three separate stages. First, the prisoner is required to timely submit a written grievance within fifteen days of the incident for review by the grievance officer, who is required to issue a written Initial Review Response within fifteen business days of the date the grievance is entered into the Automated Inmate Grievance Tracking System. (ECF No. 85, DC-ADM 804 Inmate Grievance System Procedures Manual, at pp. 8-10 (internal pages 1-2 - 1-4)). Second, the inmate may appeal an Initial Review Response/Rejection to the Facility Manager in writing within fifteen working days from the date of the response/rejection. (Id. at p. 13 (internal p. 2-1)). The Facility Manager shall then issue a decision within fifteen working days of receiving the appeal or, alternatively, may remand the Initial Review Response to the Grievance Officer for further investigation or reconsideration. In the event of a remand, the Grievance Officer shall provide a

revised Initial Review Response within fifteen working days, after which the inmate may again appeal to the Facility Manager within fifteen working days from the date of the revised response. (Id. at p. 14 (internal p. 2-2)). The decision from the appeal to the Facility Manager must be received by the inmate before he may appeal to Final Review with the Secretary's Office of Inmate Grievances & Appeals, which must be filed within fifteen working days of the date of the Facility Manager's decision. (Id. at p. 15 (internal p. 2-3)).

### c. Analysis

Here, DOC Defendant Overton has submitted the Declaration of Helen Shambaugh, who is employed by the DOC as an Administrator Officer 2 in the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). (ECF No. 84, Declaration of Helen Shambaugh, at ¶1). Ms. Shambaugh declares, in pertinent part:

> 8. In the course of my duties, I am a records custodian for all grievance appeals submitted.
>
> 9. At the request of Counsel for the DOC Defendant, I have reviewed grievance information and records for those grievances filed by [Plaintiff] for the time period he was at SCI-Albion, from May 18, 2011 to December 4, 2013, and have determined that [Plaintiff] filed 78 grievances during this time period and did appeal 7 of those grievances filed through to the final stage, which is the final appeal to the SOIGA.
>
> 10. Those 7 grievances appealed to final review are 406804, 419107, 420411, 434124, 440969, 475133 and 475894.
>
> 11. Grievance 406804 was received April 2, 2012 and it involved property.
>
> 12. Grievance 419107 was received on July 9, 2012 and it involved a medical care issue with Nurse Morris and the dispensing of [Plaintiff's] medication.
>
> 13. Grievance 420411 was received on July 18, 2012 and it involved a misconduct.
>
> 14. Grievance 434124 was received October 29, 2012 and it involved access to legal materials in the library.
>
> 15. Grievance 440969 was received December 21, 2012 and it involved

mental health care.

      16.    Grievance 475133 was received August 27, 2013 and it involved mental health staff.

      17.    Grievance 475894 was received September 5, 2013 and it involved a medical care issue with the dispensing of [Plaintiff's] medication.

      18.    Grievance 411961 was filed on May 13, 2012. [Plaintiff] prematurely attempted to appeal to final review. The appeal was filed without action.

      19.    Aside from those 7 grievances, no other grievance was properly appealed through to final review during the aforementioned time period.

(ECF No. 84, Declaration of Helen Shambaugh, at ¶¶ 8-19).

According to Plaintiff's grievance records, Grievance 411961 is the only one of the seven grievances identified by Ms. Shambaugh that relates to this case. (See ECF No. 87). This grievance was filed on May 13, 2012, and was originally denied by Defendant Overton in an Initial Review Response dated June 7, 2012. (ECF No. 87, at p. 4). Plaintiff appealed this denial to the Superintendent on June 9, 2012. (Id. at pp. 6-7). On July 3, 2012, the Superintendent remanded the grievance to Defendant Overton for further investigation and issuance of a revised initial review response. (Id. at p. 8). On the same date, Plaintiff was provided written notice of the remand, which stated that he would have the right to "once again appeal to the Facility Manager within 15 working days of the date of the revised decision." (Id. at p. 9). On July 17, 2012, Plaintiff submitted an inmate request to Ms. Arrington, Grievance Coordinator, stating, in pertinent part, "I'm also waiting for the answer from a remand of #411961 which is due 7-24-12 and will take this as a rejection if I don't hear back by 3 working days at most after due date." (Id. at p. 12). Then, on July 20, 2012, Plaintiff submitted an inmate request to the Superintendent, stating, in pertinent part, "I'm writing in regards to the remand of grievance #411961 which has been on your desk since 6-9-12 for review at the facility manager level….

Your response to grievance (appeal) #411961 is due on 7-24-12 and if I don't receive a response, I will file my final appeal to the chief secretary's office thereafter…." (Id. at p. 13). On July 27, 2012, Defendant Overton issued a revised initial review response denying Grievance 411961. (Id. at p. 15). Two days later, on July 29, 2012, Plaintiff filed a final appeal to the SOIGA ostensibly because he hadn't received a timely response to his grievance as of July 24, 2012. (Id. at p. 16). Upon his attempt to appeal to final review, Plaintiff was notified by the SOIGA that it would not take further action because he must first appeal the remanded initial response to the Superintendent. (Id. at p. 18).

Despite his premature, failed attempt to appeal Grievance 411961 to final review, Plaintiff argues that he should be deemed to have exhausted his administrative remedies because he substantially complied with SCI-Albion's grievance procedures. In making this argument, Plaintiff indirectly relies upon the Third Circuit Court's holding in Small v. Camden Cty, 728 F.3d 265 (3d Cir. 2013). In that case, the plaintiff inmate "failed to even receive a response to the grievances addressing the [relevant] incidents, much less a decision as to those grievances." Id. at 273. Based on these circumstances, the Court found that "the appeals process was unavailable to him." Id. Such is not the case here.

Unlike the inmate in Small, Plaintiff received a timely initial response to his grievance and, after remand, received a revised response two days *prior* to his hasty SOIGA appeal. Plaintiff was informed upon remand that he would have fifteen working days to appeal the revised decision to the Superintendent after its issuance. Thus, Plaintiff was not in any danger of forfeiting his appeal rights under the grievance policy. Despite this fact, Plaintiff chose to unilaterally impose a strict deadline on Defendant Overton's revised response and, when Defendant Overton did not comply with that deadline, he consciously bypassed the required step

of appealing the revised decision to the Superintendent and, instead, prematurely appealed for final review. Although the revised response was admittedly issued three days beyond its due date, it was not Plaintiff's prerogative to either hold the grievance officer's feet to the fire, or to proclaim that his appeal was deemed rejected at the facility manager level due to the late response. Plaintiff cannot orchestrate the appeal process to suit his own demands and then declare that he substantially complied with that process. Due to his failure to file a timely appeal of the revised initial review response to the Superintendent before seeking final review Plaintiff failed to properly exhaust his administrative remedies with regard to the claims in this case. As a result, Plaintiff's claims against all Defendants should be dismissed.

### III.   CONCLUSION

For the foregoing reasons, it is respectfully recommended that:

1. The Medical Defendants' motion for summary judgment [ECF No. 73] be granted; and

2. The DOC Defendant's motion for summary judgment [ECF No. 77] be granted.

In accordance with the Federal Magistrates Act, 28 U.S.C. § 636(b)(1), and Fed.R.Civ.P. 72(b)(2), the parties are allowed fourteen (14) days from the date of service to file written objections to this report and recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file objections will waive the right to appeal. Brightwell v. Lehman, 637 F. 3d 187, 193 n. 7 (3d Cir. 2011).

S/Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

Date:   November 19, 2014

cc:     The Honorable Cathy Bissoon
        United States District Judge